FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

97 APR 30  AM 9: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

**ANTOINETTE J. PEOPLES,**    ]
                             ]
   Plaintiff(s),         ]
                             ]
   vs.                   ]    CV-96-N-0118-S
                             ]
**MARCUS CABLE OF ALABAMA,**  ]
**L.P.,**                     ]
                             ]
   Defendant(s).         ]

ENTERED

APR 30 1997

### Memorandum of Opinion

### I.    Introduction.

In this employment discrimination action, the plaintiff, Antoinette J. Peoples ("Ms.

Peoples"), asserts claims against defendant, Marcus Cable of Alabama, L.P. ("Marcus

Cable"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII").[1]  Specifically, Ms. Peoples contends that she was continually harassed

by her supervisor, Mike Kelly ("Kelly"), from July 1993 until her termination in March 1995.

She claims that she "was discriminated against on the basis of sex and retaliation with

regards to harassment, discharge, promotions, transfers, job and/or work assignments and

other terms and conditions of employment." *Complaint* at 3.  She brings two claims: "(1)

she was subjected to discriminatory discipline in connection with the February 23, 1995,

final warning and the events that led up to it; and (2) the defendant retaliated against her

---

[1] The plaintiff originally included a claim pursuant to 42 U.S.C. § 1981. The court dismissed this claim without prejudice in an order entered on May 10, 1996, because the complaint made no allegations of race discrimination. The plaintiff has never amended her complaint to include a section 1981 claim. Thus, there is no § 1981 claim in this action. *See Pretrial Order of March 17, 1997.*

43

for exercising protected rights, specifically, the filing of the EEOC charge on February 14,
1995." *Pretrial Order of March 17, 1997* at 7.

The case is presently before the court on the defendant's motion for summary
judgment, filed on March 3, 1997. The motion has been fully briefed and was submitted
for decision at the court's regularly scheduled motion docket on April 29, 1997. Upon due
consideration, the motion will be granted in part and denied in part.

**II.    Statement of Facts.**[2]

The plaintiff was employed by Cencom Cable Television from December 6, 1989,
until October of 1994. Cencom Cable Television was managed by Crown Cable. In the
fall of 1994, the defendant, Marcus Cable, took over management of Crown Cable and
completed the purchase of the Crown Cable system in approximately January 1995. Ms.
Peoples received a copy of all employee handbooks on the subject of Marcus Cable's
equal employment opportunity policy. As a supervisor, she had access to all relevant
manuals on policy and procedure.

Ms. Peoples was hired as a direct sales representative on December 6, 1989. She
was then promoted to direct sales trainer, a position she held for approximately two years.
In June 1993, she was promoted to direct sales supervisor ("DSS") and remained in that
position until her termination in March 1995. Mike Kelly transferred from the Illinois Marcus
Cable system to the defendant's Birmingham, Alabama system in June of 1993 as General

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their
respective responses to those submissions, and the court's own examination of the evidentiary record. These are
the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S.
Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

Sales Manager and became Ms. Peoples's direct supervisor.  Until Kelly's arrival, the plaintiff's personnel file contained no written discipline or any written notations of verbal discipline.  The file did contain, however, various written memoranda regarding her job performance dated after Kelly's transfer to Birmingham in June 1993.

As DSS, the plaintiff's duties and responsibilities required her, among other things, to develop a professional direct sales force, maintain a personal sales quota of 20 Basic sales per pay period, interact with customers to resolve complaints related to the direct sales department, and perform other related duties or projects as required by management. *Plaintiff's Deposition* at Ex.  1.  Ms. Peoples received performance evaluations in July and December 1994.  In the July 1994 review, the plaintiff received "overall scores of four on a scale of one to five[, with] one being high." *Preston Deposition* at 77.  At the same time, Ms. Peoples received a "special" review so that Kelly could give her a final written warning.  On July 7, 1994, Kelly made a written note of the plaintiff's complaints to Marcus Cable corporate headquarters regarding unfair treatment.  Between July 1994 and the December 1994 performance evaluation, the plaintiff did not receive any written disciplinary measures.  Her December 1994 evaluation "showed noticeable improvement in most areas." *Plaintiff's Deposition*  at Ex.  2.  She received five ratings of "Good" and thirteen ratings of "Satisfactory."[3]  In that review, Kelly suggested as part of Ms. Peoples's goals and objectives for the next six months that she "[m]eet [the] monthly budget in 1995,"

---

[3] The performance review rating scale consisted of rankings of Excellent, Good, Satisfactory, Needs Improvement, and Unsatisfactory.

"[m]otivate [the] sales force," *Preston Deposition* at Ex. 2, and concentrate on hiring new sales representatives.

Kelly went out of town in late January and early February of 1995 and specifically instructed Ms. Peoples not to work on the payroll while he was absent. He felt such action would present an ethical conflict for the plaintiff because of her method of compensation. Rather, during an emergency meeting held on January 27, 1995, he told Ricardo Carter[4] and Ms. Peoples that the plaintiff was to instruct Garceal McClain, an administrative assistant under the direct supervision of Mr. Carter, how to complete the payroll.[5] The instruction never occurred, and Mr. McClain did not complete the payroll. Instead, Ms. Peoples completed it when Mr. McClain failed to request her assistance in order to ensure that her employees received their paychecks on a timely basis.

Upon Kelly's return to work, he learned that the plaintiff had completed the payroll despite his instructions. He therefore met on February 10, 1995, with the plaintiff and Ricardo Carter regarding the payroll incident, and on February 13, 1995, he received memoranda outlining their accounts of the incident. *Plaintiff's Exhibit 16* at 1 (unnumbered pages). Kelly believed that both the plaintiff and Mr. Carter were responsible for coordinating and carrying out his instructions regarding payroll. Ms. Peoples filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 14, 1995, against Marcus Cable, asserting that Kelly "has been harassing me

---

[4] According to Marcus Cable's Alabama Marketing Organizational Chart, Mr. Carter and the plaintiff were considered to be peers in the management hierarchy.

[5] The parties dispute whether Ms. Peoples was to take the initiative and go to Mr. McClain, or rather, whether Mr. McClain was to request such instruction from the plaintiff.

4

since he arrived in July 1992 [sic] and continuing.  No reason has been given for this harassment; she [sic] treats males better than females.  I believe I am being discriminated against because of my sex, Female . . . ." *Defendant's Exhibit 6*.  Between February 13 and 15, 1995, Kelly summarized the events that transpired during his absence and the plaintiff's and Mr. Carter's versions of those events in separate meetings with Liz Donaldson, Human Resources Manager for the Birmingham Marcus Cable office, and Frank Leiter, the General Manager for the Birmingham office.  *Id.*  at 2.  On February 15, 1995, Kelly met with Ms. Peoples to discuss the payroll incident. She confirmed that  she understood she had no authority in administrative areas and informed Kelly of her recent EEOC charge alleging sex discrimination.  *Id.* at 2-3.

Later that day, Kelly contacted Cindy Mannes, Vice President of Human Resources and Corporate Administration, to discuss the insubordination issue and the resulting corrective action Kelly should take. On February 16, 1995, Kelly wrote a memorandum in which he stated that the plaintiff "should be terminated or removed from her position as Supervisor clearly because of insubordination. . . . Toni [the plaintiff] has a Final Written warning [dated July 14, 1994] in her file summarizing the consequences of insubordination." *Preston Deposition* at 143-44; *Plaintiff's Exhibit 16* at 2.  Ms. Mannes instead instructed Kelly to place Ms. Peoples on probation.  Ms. Mannes made this decision based upon Kelly's representation of the events and without personally reviewing the plaintiff's personnel file.  She was unaware of any difficulties Ms. Peoples had experienced meeting her sales quotas, budgeted staffing levels, and quality standard at the time of check in for cash sales.

5

Pursuant to Ms. Mannes's instructions, Kelly issued Ms. Peoples a final warning and placed her on probation on February 23, 1995, for a minimum of ninety days and stated that "[p]erformance 'must' improve or termination will result." *Plaintiff's Exhibit 8*. He listed the plaintiff's performance goals for the probationary period, stating that he would review her performance every thirty days. *Plaintiff's Deposition* at Ex. 2. He instructed that "[i]mproved performance in all the above areas will determine the length of the probation[, while] [e]xceeding the performance of the position will void the probation." *Id.* Kelly then instructed Ms. Peoples to complete the payroll for the pay period occurring during Kelly's absence. Ricardo Carter received a verbal warning as a result of the payroll incident. Other than this reprimand, Mr. Carter has not been disciplined while employed at Marcus Cable. Mr. McClain was never disciplined for his failure to complete the payroll.

Ms. Peoples failed to meet her personal sales quota of twenty basic sales per pay period for the pay periods ending January 26, February 9, February 23, and March 9, 1995. She also failed to meet the budgeted level of staffing for direct sales representatives[6] and did not maintain the sixty percent cash quality standard at time of check in with her sales representatives.[7] She was not disciplined or placed on probation for these failures prior to the date on which she filed her EEOC charge. However, sales, staffing, and quality

---

[6] The parties agree that, while Kelly did not allow Ms. Peoples to interview candidates for sales representative without Ricardo Carter also being present, he did allow Mr. Carter to interview candidates alone. When Ms. Peoples confronted Kelly about this difference in treatment, he informed her he had made such a decision because Mr. Carter had more experience interviewing job candidates than did Ms. Peoples.

[7] The plaintiff maintains that the majority of the sales staff failed to maintain the quality standard.

6

goals were among the plaintiff's objectives during the probationary period beginning on February 23, 1995. *Plaintiff's Deposition* at Ex. 2, ¶¶ 4, 7, 10.

Although Kelly had the authority to terminate an employee, before doing so, he was required to contact Corporate Human Resources. On March 28 or 29, 1995, Kelly contacted Mary Preston regarding his desire to terminate the plaintiff. As documentation, Kelly sent Ms. Preston budgeted sales statements, budgeted sales quotas, and documentation of an audit. Ms. Preston did not review the plaintiff's personnel file. Ms. Preston subsequently approved Kelly's request, and Kelly terminated the plaintiff's employment on March 29, 1995, issuing a letter citing three major reasons for his action: the plaintiff's failure to meet her sales, her staffing, and her quality goals. According to Ms. Preston, other reasons not listed in the letter supported the decision to terminate the plaintiff: Ms. Peoples's past record of insubordination, customer complaints about her behavior, a past warning for driving without a license while on company business for a period of seven months[8], unprofessional conduct, and her relationships with peers, subordinates, and superiors. Kelly informed Ms. Peoples of her termination on March 30, 1995. On that same day, the plaintiff interviewed a candidate for direct sales representative. The plaintiff was subsequently replaced as DSS by Joe Darcy, a male.

Marcus Cable follows a progressive discipline policy. According to this policy, one of the purposes of placing an employee on probation is to allow him or her an opportunity to improve his or her performance.

---

[8] This incident occurred fifteen months prior to the plaintiff's termination. She was "written up" in November 1993 for allowing her license to expire seven months earlier although she had already had the license reinstated.

7

The plaintiff believes that Kelly began to harass her because he did not want her or anyone else in the DSS position as he had not had such a position reporting to him when he worked in the Illinois Marcus Cable system.[9] While Ms. Preston was preparing the defendant's response to the plaintiff's EEOC charge, she spoke with Jerry Roth, Vice President of Human Resources for Crown Cable; Steve Brockett, Vice President of Operations for the Birmingham District; Penny Harris-Johnson, Director of Customer Service for the Birmingham office; and Liz Donaldson, Human Resources Manager for the Birmingham office to confirm that they had no knowledge that any female employees had complained about Kelly in the past. Kelly never said anything to the plaintiff that was inappropriate and of a sexual nature or made statements such as, "I do not like you because you are a woman" or "I do not think you can do something because you are a woman." *Plaintiff's Deposition* at 244. The plaintiff believes that Kelly maintained men could perform better than women.

On April 6, 1995, the plaintiff filed an amended charge of discrimination with the EEOC against Marcus Cable, alleging sex discrimination and retaliatory discharge for filing the original EEOC charge. She filed the instant action on January 16, 1996.

## III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[9] In Ms. Peoples's testimony at deposition, she first stated that Kelly had informed her he did not want her in the DSS position. She then changed her testimony to reflect that Kelly did not want *anyone* in the position. *Plaintiff's Deposition* at 128.

8

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

9

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing

10

of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion.

Ms. Peoples claims that the defendant discriminated against her on the basis of sex when Mike Kelly placed her on probation for her insubordination during the payroll incident and that the defendant retaliated against her for filing an EEOC charge by terminating her employment. A plaintiff who alleges disparate treatment based upon gender under Title VII must prove that the defendant acted with discriminatory purpose. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) (race discrimination case). A plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case, *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989), and may establish a prima facie case in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

## A.   Direct Evidence and Statistical Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*,

11

870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted). A second means by which Ms. Peoples may establish a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of sex discrimination on behalf of Marcus Cable. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). The plaintiff has presented no direct or statistical evidence of discrimination; therefore, she must attempt to establish a prima facie case of discrimination through circumstantial evidence.

## B. McDonnell Douglas Test.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[10] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring it to articulate some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary

---

[10] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

12

judgment is warranted.'" *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment.'" *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may prove that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons,

13

together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.).

Not only are Kelly's actions and motivations relevant to the inquiry; those of Cindy Mannes and Mary Preston are as well. On February 15, 1997, Kelly contacted Ms. Mannes to relate the payroll incident to her and to discuss corrective action. Although the next day Kelly wrote a memorandum indicating his desire to terminate the plaintiff, Ms. Mannes instead instructed Kelly to place Ms. Peoples on probation. Kelly also contacted Ms. Preston when he wished to terminate the plaintiff, and Ms. Preston approved the disciplinary measure. Therefore, Kelly, Mannes, and Preston were all involved in making the disciplinary decisions. Marcus may be liable if any one of them was motivated by gender bias. *See Jones*, 874 F.2d 1534, 1542 n. 13 ("Disparate treatment analysis requires that none of the participants in the decision-making process be influenced by . . . bias.").

### 1.   Disparate Treatment Claim.

The plaintiff claims that Marcus Cable discriminated against her when Mike Kelly placed her on probation for her insubordination during the payroll incident. She in essence makes a disparate treatment claim in that she contends that she was disciplined for conduct that other similarly situated coworkers were not. In order to establish a prima facie case of such discrimination, Ms. Peoples must demonstrate that (1) she is a member of a protected class; either (2) she did not violate a work rule; or (3) she engaged in misconduct similar to that of a person outside the protected class; and (4) the disciplinary

14

measures enforced against her were more severe than those enforced against the other persons engaged in similar misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).[11] To establish the requisite degree of similarity between herself and her comparator, Ms. Peoples must show that the male employee engaged in "'nearly identical' conduct" but was not put on probation for such conduct.    *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

The plaintiff, however, has failed in her burden to establish a prima facie case of gender discrimination, for she has not demonstrated that any coworker engaged in similar misconduct and was disciplined less severely for doing so. Ms. Peoples clearly is a member of a protected class. She violated Kelly's January 1995 directive not to complete the payroll while he was absent. Mr. McClain was to complete it but did not; therefore, Ms. Peoples did so despite Kelly's instructions. The plaintiff was placed on probation for the incident, while Mr. McClain was not disciplined. Mr. McClain, however, was instructed to complete the payroll and failed to do so, while the plaintiff was instructed not to do so. Additionally, there is some dispute as to whether it was Mr. McClain's responsibility to

---

[11] The defendant contends that the disparate discipline test set out in *Jones v. Gerwens* is the applicable version of the *McDonnell Douglas* test in this case. *Movant's Initial Submission* at 16. The plaintiff, however, asserts that a termination version of the test is instead applicable. *Opponent's Responsive Submission* at 18. A termination test would require that, in order to establish a prima facie case of discrimination, the plaintiff would have to demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was terminated; and (4) she was replaced by a member outside the protected class. *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603 (11th Cir. 1994).

In *Cooper-Houston*, the Eleventh Circuit stated that the test as set out in *Jones* "applies only to Title VII cases in which a plaintiff has not been terminated and therefore cannot show that he or she was replaced by a person outside of the protected class." *Id.* at 605 n. 4. The *Cooper-Houston* plaintiff, however, asserted that her employment was terminated because of her race. In the instant case, Ms. Peoples asserts instead that she was put on probation because she is female. *See Pretrial Order of March 17, 1997* at 7. She does not aver that she was terminated because of her gender. Rather, she contends that Kelly ultimately terminated her employment in retaliation for her filing a charge of discrimination with the EEOC. This case is therefore distinguishable from *Cooper-Houston*.

15

instigate the payroll completion process or whether Ms. Peoples was to take the initiative and instruct him. McClain and the plaintiff therefore cannot be said to have engaged in "nearly identical conduct." Ricardo Carter did not engage in nearly identical conduct either in that he did not complete the payroll in violation of Kelly's orders. Kelly, however, had not instructed Carter that he was not to complete the payroll; rather, Carter's subordinate, Mr. McClain, was to do so but did not. While it is undisputed that Kelly believed both Carter and the plaintiff to be responsible for the payroll incident, Carter was at most guilty of failing to ensure that his subordinate performed his assigned duties and of failing to apprise Kelly of the situation immediately upon Kelly's return.[12]  Ms. Peoples, on the other hand, violated the express prohibition against completing the payroll. Although Carter received a verbal warning, while Ms. Peoples received the more severe ninety-day probationary period, their misconduct was not "nearly identical."

Assuming, *arguendo*, however, that she could establish a prima facie case of gender discrimination, she still cannot maintain her claim in the face of a motion for summary judgment. According to the *McDonnell Douglas* analysis, the burden would then shift to Marcus Cable to demonstrate it had a legitimate, nondiscriminatory reason for placing the plaintiff on probation and for treating her more harshly than it did Mr. Carter or Mr. McClain. The defendant can satisfied this burden, for it has shown that Ms. Peoples was clearly insubordinate. She admitted to Kelly in their February 1995 meeting that she was aware she was specifically instructed not to complete the payroll. There are no facts

---

[12] Kelly opines in his memorandum of February 16, 1995, that these are the instances of misconduct for which he will discipline Mr. Carter. He indicates that the plaintiff, on the other hand, should be "terminated . . . because of insubordination." *Plaintiff's Exhibit 16* at 2 (unnumbered pages).

16

indicating, however, that Kelly also thought either Mr. Carter or Mr. McClain had been insubordinate. Additionally, Ms. Peoples received a final written warning in July of 1994, while Mr. Carter had never before been disciplined for any misconduct and there is no evidence of Mr. McClain's disciplinary record. Although the plaintiff had received a good-to-satisfactory performance review in December of 1994, such review did not erase the final written warning from her record. Mr. Carter, however, had no record of prior discipline, and he received a verbal warning. Furthermore, "[t]he law is clear that . . . an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones*, 874 F.2d at 1540; *see also Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The evidence is undisputed that Kelly believed the plaintiff was insubordinate and deserved corrective action.

Accordingly, the burden would then shift back to Ms. Peoples to establish by a preponderance of the evidence that the defendant's legitimate reason is merely pretext for discriminatory treatment. The plaintiff, however, has presented no evidence to demonstrate that gender discrimination motivated Ms. Mannes to recommend that the plaintiff be put on probation, Kelly to follow such a recommendation, or either of them to treat her more harshly than either Carter or McClain. As stated previously, Ms. Peoples's conclusory allegations of gender discrimination are insufficient to meet this portion of her burden. Conclusory allegations are all that she has offered, however. Accordingly, the defendant's motion to the extent that it seeks summary judgment on the disparate treatment claim will be granted and the claim dismissed.

17

## 2. Retaliatory Discharge Claim.

Ms. Peoples further asserts that Marcus Cable terminated her in retaliation for her charge of discrimination filed with the EEOC on February 14, 1995. Title VII protects employees from discrimination by employers because the employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). A plaintiff need not prove the actual existence of those unlawful employment practices; rather, he need only have a reasonable belief that the defendant engaged in such practices. *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1000 (1982).

In order to make out a prima facie case of retaliatory discharge, the plaintiff must show that (1) she was engaged in statutorily protected expression, (2) Marcus Cable took adverse employment action against her, and (3) there was a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. Unit A 1981). Once a prima facie case is established, the defendant must articulate some legitimate, nondiscriminatory reason for the plaintiff's termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that this reason is merely a pretext for discrimination. *Id.* at 804.

In the Eleventh Circuit, "statutorily protected expression" includes filing an EEOC charge, 42 U.S.C. § 2000e-3(a), formal and informal complaints to an employer, *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989), written protests, *Smalley v. City of Eatonville*, 640 F.2d 765 (5th Cir. Unit B 1981), and warnings from

18

employers not to complain about alleged discriminatory practices, *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992).

Ms. Peoples has established both that she was terminated and that she was engaged in statutorily protected expression. Viewing the undisputed facts in a light most favorable to the plaintiff, a jury might infer that the EEOC charge and the plaintiff's termination were causally related. Ms. Peoples informed Kelly on February 15, 1995, that she had filed an EEOC charge asserting that he had discriminated against her. On February 23, 1995, he placed her on probation and then terminated her employment on March 29, 1995.

The burden therefore shifts to the defendant to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. Marcus Cable meets this burden, for it has demonstrated that the plaintiff was deficient in three performance areas and asserts that she was terminated for such deficiency.

Accordingly, the burden returns to the plaintiff to establish that these reasons were mere pretext for gender discrimination. The undisputed facts, when viewed in a light most favorable to Ms. Peoples, are such that a reasonable jury could find that the reasons offered by Kelly for the plaintiff's termination were in fact pretext. While it is true that Ms. Peoples admits her insubordination and that therefore the probationary discipline was warranted, the probationary period was to have been for a minimum of ninety days with periodic progress reviews every thirty days. Thirty days passed, but Kelly did not review the plaintiff's progress toward the itemized performance goals with her; rather, he terminated her for failing to meet three of them. The undisputed facts establish that the plaintiff in fact failed to meet these goals, yet they also demonstrate that Marcus Cable's corporate policy

19

established a progressive disciplinary program. The goal of this program was to advise employees of areas of performance deficiency and to give them the opportunity to improve in those areas. The plaintiff's probationary period was to last a minimum of ninety days, yet she was not afforded the opportunity to improve. She was terminated. Furthermore, prior to the time Ms. Peoples filed an EEOC charge, she had not attained these goals. She was not disciplined for such failure, however, until after Kelly had learned of the EEOC charge. Approximately one month after Kelly placed her on probation, he terminated her. A reasonable jury could infer from this chain of events, therefore, that because Kelly had been previously aware of Ms. Peoples's performance shortcomings and took no corrective action until after he learned of the EEOC charge, his true motive in terminating the plaintiff's employment was in fact retaliation. Timing alone is insufficient to create an inference of pretext. *Booth v. Birmingham News Co.*, 704 F. Supp. 213, 215-16 (N.D. Ala.), *aff'd*, 864 F.2d 793 (11th Cir. 1988). But Ms. Peoples does not rely solely on the timing of the events in question to demonstrate pretext. Rather, she has also established that she had not been disciplined for failing to attain her sales, staffing, and cash quality goals until Kelly learned of the EEOC charge. The inference that a reasonable person could make from both the timing of the events and Kelly's earlier failure to discipline the plaintiff is sufficient to meet the plaintiff burden. Accordingly, the defendant's motion for summary judgment to the extent it addresses the claim for retaliatory discharge will be denied.

## V.   Conclusion.

Accordingly, the defendant's motion for summary judgment will be granted in part and denied in part. The plaintiff's claim of gender discrimination in disciplinary measures

will be dismissed, while her claim of retaliatory discharge will remain viable.  The court will

enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___29th___ of April, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

21